M. J. Haden
Staff Attorney
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>TEFFIN C. GOSS, II,<br><br>              Defendant. | Case No. 4:06-cr-0024-RRB-TWH<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS** |

**I.    FACTS**[1]

On April 15, 2006, Teffin Goss was stopped by Officer Keeler of the University of Alaska Fairbanks Police Department for driving through a red light at the intersection of Giest Road and Fairbanks Street.  Responding promptly to Keeler's emergency lights, Mr. Goss stopped on Giest Road just prior to Jenny Lane.  Keeler exited his vehicle and approached Goss at his driver's side window.  Goss admitted that he went through the light as it was changing, explaining that he was talking on his cell phone and

---

[1] The following facts are taken from an audio/video recording that was supplied to Mr. Goss pursuant to Fed. R. Crim. P. 16.  A copy of audio portion of the recording will be filed with the court.

when he looked up the light was changing. He stated that he went through the light rather than trying to make an abrupt stop.

Keeler asked Goss for his license, insurance and registration, then, instructed Goss to pull into the Pizza Hut parking lot after surrendering the requested items. Goss followed the officer's instructions. Keeler, with Goss's documents in hand, followed Goss into the parking lot.

Goss remained in his vehicle while Keeler contacted UAFPD dispatch. Keeler requested that dispatch check Goss's license through APSIN. APSIN verified that Goss had a valid license. A records check also was done on the vehicle and came back unremarkable. Keeler then requested that dispatch check to see if Goss had any prior "case involvement/criminal history" involving drugs. The dispatch operator responded affirmative, but provided no details.

With this information, Keeler requested that a back up officer be sent to the scene as he was going to attempt to obtain consent to search Goss's vehicle. Keeler remained in his vehicle until Sgt. Barth arrived. Once Sgt. Barth was present, Keeler once again approached the driver's door of Goss's car. He ordered Goss out of his vehicle and asked Goss is he had "anything on him." Keller proceeded to pat search Goss. He then asked Goss for his home address, his phone number, and his employer's name. Goss responded with timely answers. Keeler followed with questions concern the rental car that Goss was driving. Goss explained that the rental car belonged to a friend and provided the officer with the friend's name. Immediately following, Keeler asked Goss for permission to search the vehicle. Goss refused, stating that it was not his car and that he had had a prior bad experience with police by consenting to a search. Keeler asked if there would

be any reason why a police K-9 would alert on the vehicle. Goss replied no. Keeler followed by asking Goss if he would consent to a K-9 inspection. Goss replied that if that was what it was going to take for him to be on his way, then that is what would have to happen. Keeler told him that all it would take for him to go home was to let him look inside the vehicle. Goss again did not consent.

Keeler contacted AST for a K-9 unit. Approximately 20 minutes after the initial stop, AST Mobley arrived with the K-9 unit. As Goss had two pet dogs in his car, Mobley order him to remove the pet dogs from his vehicle and place them in the patrol vehicle. Goss did as the officer ordered. Mobley then proceeded to lead the K-9 around Goss's vehicle. When the dog approached the driver's door, it barked. Mobley opened the driver's door and allowed the dog to enter the vehicle. Mobley followed the dog. After removing the dog, Mobley opened the middle console of the vehicle where he found a camera case. Mobley then opened the camera case and found a substance later identified as crack cocaine. Goss was placed under arrest. The car was impounded and a warrant was obtained leading to a further search.[2]

## II.   ARGUMENT

### A.   The Officers Violated Goss's Fourth Amendment Right by Exceeding the Scope of the Traffic Stop

Goss was stopped for a routine traffic violation. He does not challenge the justification for the stop, but asserts the detention and questioning exceeded the scope of the initial traffic stop and was neither consensual nor supported by reasonable suspicion.

---

[2] At the current time, Mr. Goss has not been provided a copy of the warrant or affidavit. The government is in the process of having the state court documents unsealed.

The Fourth Amendment prohibition against unreasonable searches and seizures extends to the investigatory stop of a vehicle. United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1121 (9th Cir. 2002). The constitutionality of an investigative detention is judged under the framework established in Terry v. Ohio, 392 U.S. 1, 19-20 (1968), which provides that the scope of an investigative detention must be "carefully tailored to its underlying justification . . ., and [may] last no longer than is necessary to effectuate the purpose of the stop." United States v. Chavez-Valenzuela, 268 F.3d 719 (9th Cir. 2001), amended by 279 F.3d 1062 (2002). The Supreme Court established the basic requirements for detaining a driver after a traffic stop in its decisions in United States v. Brignoni-Ponce, 422 U.S. 873 (1975), holding that any questioning must relate to the purpose of the stop, and in Florida v. Royer, 460 U.S. 491 (1983), holding that the detention must be temporary and unintrusive. See also United States v. Chavez-Valenzuela, 268 F.3d at 724 n.4. Questioning that exceeds the purpose of the stop violates Terry.

Reasonable suspicion exists if, looking at the totality of the circumstances, the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. Sigmond-Ballesteros, 285 F.3d at 1121 (quoting United States v. Arvizu, 534 U.S. 266 (2002)). Questions asked during a traffic stop must be "reasonably related in scope to the justification for their initiation." United States v. Perez, 37 F.3d 510, 513 (9th Cir. 1994). An officer may broaden the scope of questioning if he notices additional suspicious factors. Id. But those additional factors must be supported by reasonable suspicion, i.e., particularized and objective factors.

In the case at hand, the officers exceeded the scope of the stop. First, Keeler purposefully detained Goss until an additional officer arrived on the scene. He did this with the intent to obtain consent to search from Goss. Next he questioned Goss about whether there were any weapons or contraband in the vehicle, a question that was clearly unrelated to running a red light. Then he did a pat search of Goss. Again, the search was beyond the scope of a stop for a simple traffic violation. Although the investigation concerning the running of the stop light concluded when Goss admitted his conduct and all information concerning Goss's license and tag information was accurate and current, the officer continued to detain him. The officer's motives are clear as he tells dispatch on the recording that he is going to attempt to get a consent to search the vehicle. Goss was detained for over twenty minutes as the officers waited for the K-9 unit to arrive. The extended detention exceeded the scope of the original stop, was not supported by reasonable suspicion and was not consensual.

**B.    Any Alleged Consent by Goss Was Involuntary**

An encounter is not consensual if a reasonable person would have believed he was not free to leave. In <u>Chavez-Valenzuela</u>, the court found that the stop was not a consensual encounter even though the officer had returned the defendant's license and registration. "At that stage of the encounter, Chavez-Valenzuela had been standing by the side of the highway for more than seven minutes and subjected to a number of 'fishing expedition' questions about his travel plans and his occupation." <u>Id.</u> Upon returning the defendant's license and registration the officer "asked him a question implying that he suspected Chavez-Valenzuela of criminal activity." <u>Id.</u> at 725. A reasonable person

confronted with that situation, even with license and registration in hand, "would not have believed he could disregard the officer's inquiry and end the conversation." Id. The same is true here. In fact, Keeler told Goss that a K-9 dog was on the way. He also told him that the only way he was going to get to leave was to consent to a search or wait for the K-9.

Where the validity of a search rests on an alleged consent, the government has the burden of establishing that the necessary consent was freely and voluntarily given. Florida v. Royer, 460 U.S. 491 (1983). This burden is not satisfied by establishing mere submission to a claim of lawful authority. Bumper v. North Carolina, 391 U.S. 543 (1968); United States v. Chan-Jimenez, 125 F.3d 1324, 1327-28 (9th Cir. 1997).

The question of whether a consent to search was voluntary as opposed to the product of implied coercion is determined by evaluating the totality of the circumstances surrounding the consent. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Knowledge that one has the right to refuse to consent is highly relevant to a determination that there has been an effective consent. United States v. Mendenhall, 446 U.S. 544, 558-59 (1980). Here, any alleged consent was involuntary.

**C.  Any Alleged Subsequent Consent by Mr. Goss Was Tainted by the Illegal Detention**

"Under the Fourth Amendment, evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding the suspect's consent, unless subsequent events have purged the taint." United States v. Chavez-Valenzuela, 268 F.3d 719, 727 (9th Cir. 2001); Florida v. Royer, 460 U.S. 491, 507-08 (1983).

6

> In determining whether the taint has been sufficiently purged, we ask "whether, granting establishment of the primary illegality, the evidence . . . has been come at the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." United States v. Millan, 36 F.3d 886, 89 (9th Cir. 1994) (internal quotation marks omitted). Elements to be considered in answering this question include temporal proximity between illegality and consent and the presence of intervening circumstances. These factors "go primarily to the question whether an illegally arrested or detained defendant's response to police questioning is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" United States v. George, 883 F.2d 1407, 1416 (9th Cir. 1989) (quoting Wong Sun, 371 U.S. at 486, 83 S. Ct. 407). We also take into account "the purpose and flagrancy of the official misconduct." Id.

268 F.3d at 727-28.

The government may suggest that Goss consented to the K-9 search or consented to the K-9 entering his vehicle. However, just as in Chavez-Valenzuela, by the time Goss was approached regarding permission for either of these intrusions, he already had been detained without reasonable suspicion. Thus, pursuant to the Fourth Amendment any evidence obtained as a result must be suppressed.

DATED this 23rd day of June, 2006.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ M. J. Haden
Staff Attorney
Georgia Bar No. 316531
601 West Fifth Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mj_haden@fd.org

Certification:

I certify that on June 23, 2006, a copy of the foregoing document, with attachments, was served electronically on:

Bryan Schroder, Esq.

/s/ M. J. Haden