IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      PLAINTIFF,<br><br>vs.<br><br>TEFFIN C. GOSS, II,<br><br>      DEFENDANT. | CASE NO. 4:06-CR-00024-RRB-TWH<br><br>RECOMMENDATION RE:<br>DEFENDANT'S MOTION TO SUPPRESS<br>(DOCKET NO. 22 AND 23) |

Defendant, Teffin C. Goss, II, has filed a Motion to Suppress all evidence obtained as the result of a warrant less search of his vehicle on April 15, 2006. Defendant advances three arguments in support of his motion. They are A) The officers violated Goss' Fourth Amendment right by exceeding the scope of the traffic stop; B)Any alleged consent by Goss was involuntary; C)Any alleged subsequent consent by Mr. Goss was tainted by the illegal detention.

The Government has filed an Opposition opposing the defendant's Motion to Suppress at Docket 37.

This court conducted an Evidentiary Hearing spread over three days. The hearings took place on July 17, 2006 (Transcript at Docket No. 39), July 26, 2006 (Transcript at Docket No. 40) and August 9, 2006 (Transcript at Docket No. 43). During the hearing, testimony was given by Officer Keeler of the University of Alaska

1

Fairbanks Police Department and Trooper Mobley of the Alaska State Trooper. This court heard the testimony of the witnesses, reviewed all exhibits introduced by the parties and listened to arguments from counsel. Upon due consideration of the evidence introduced and the arguments of counsel this court now submits its Report and Recommendation.

<u>FACTS</u>

On April 15, 2006, at 11:10 p.m., Officer Keeler, while on routine patrol, observed the defendant drive through a red light at the intersection of Geist Road and Fairbanks Street in Fairbanks, Alaska. Officer Keeler turned on his emergency lights and pulled the defendant over on Geist Road near Jenny Lane. Officer Keeler got out of his vehicle and approached the defendant at the driver's side window of the vehicle the defendant was driving. After a short conversation the defendant admitted to Officer Keeler that he had run the red light. Officer Keeler then asked the defendant for his driver's license, car registration and car insurance. The defendant produced his license and a rental agreement for the car the defendant was driving. Officer Keeler then directed the defendant to drive his vehicle into the parking lot at the Pizza Hut restaurant located near by.

The defendant drove his vehicle into the parking lot as directed while Officer Keeler contacted UAF PD dispatch to verify basic information about the defendant and his vehicle. Officer

2

Keeler was informed that the defendant's license was current, he had no warrants and that the vehicle was a rental car.  Officer Keeler asked dispatch whether or not there was a "3500 history" on the defendant.  "3500 history" is ASPIN code for any "history" involving illegal drugs.  Officer Keeler was informed the defendant had a "3500 history" but no additional information was provided.

The encounter between the defendant and Officer Keeler was mostly recorded on video and audio tape.  The video and audio tapes were played at the hearing.  The audio portion of the encounter between the defendant and Officer Keeler was transcribed and introduced as Exhibit A.  On Page 3 of Exhibit A the following radio conversation took place between Officer Keeler and radio dispatch:

RADIO DISPATCH: Vehicle is a 2004 Toyota Camry, four-door, gray, 10-97 (indiscernible) Anchorage and Fairbanks, Alaska Rental Car.  Teffin (indiscernible) Goss II, born in '81, it's a '97 valid, no restrictions.

OFFICER KEELER:10-4.  Go ahead and look to see if there's any 3500 involvement (indiscernible).

RADIO DISPATCH:     Affirmative.

OFFICER KEELER:10-4.  Have 2-1 or 2-7 (indiscernible) down here and we'll see if we can do a consent search.

Officer Keeler testified that he made the following observations during the initial contact with the defendant and that these observations led him to believe the defendant might be involved in narcotics trafficking and that is why he decided to ask the defendant for a consent search of his vehicle.

1.    The rental car the defendant was driving was registered to another person, the defendant was not a listed driver for the rental car and the defendant had a local address listed on his driver's license.    Officer Keeler testified that he normally observes rental cars being driven by tourists and that sometimes drug traffickers use rental cars to drive between Fairbanks and Anchorage.

2.    Officer Keeler observed several air fresheners hanging inside the car.    Some were on the rear view mirror and some were inside the car at the passenger and driver doors.    Officer Keeler testified that rental cars are cleaned regularly and that air fresheners are sometimes used to mask the odor of narcotics in a vehicle.

3.    Officer Keeler saw a radar detector in the rental vehicle.    Officer Keeler testified radar detectors are not as prevalent in town and that sometimes drug traffickers use radar

4

detectors to alert them to the presence of police in the area.

Officer Keeler testified he began writing the traffic citation for running the red light at approximately 11:11 p.m. (Transcript 1-67) and that it normally takes "between seven and ten minutes, sometimes longer," to write a traffic ticket. (Transcript 1-9).

When back up Officer Barth arrived on the scene at 11:16 p.m., Officer Keeler exited his patrol car and directed the defendant to come to where Officer Keeler was standing in front of the police cruiser. Officer Keeler's police cruiser was equipped with a camera focused on the spot where the defendant was told to stand next to Officer Keeler. Officer Keeler said that having a motorist exit his vehicle during a traffic stop was not a typical procedure (Transcript 1-70).

When the defendant came to where he was standing, Officer Keeler conducted a quick pat down search of the defendant. He did not find any contraband or weapons that might compromise the situation or put him at risk.

Officer Keeler then began questioning the defendant. He first asked the defendant for his phone number and the name of the defendant's employer, which the defendant supplied. He then asked

the defendant his work phone number and the defendant stated he did not know it by heart.   Officer Keeler then asked the defendant whether or not he was renting the car from his employer and the defendant said it was a Dollar rental car.   In fact it was an Avis rental car.   Officer Keeler then asked the defendant if there were any illegal firearms or anything like that in the car.   The defendant replied in the negative.   The following verbal exchange then took place:

OFFICER KEELER:   Do you have any problem with me looking at the vehicle?

MR. GOSS: It's not my rental car, but no.

OFFICER KEELER: It's – you don't have a problem with me checking the vehicle?

MR. GOSS: I can't –I can't say that I can.

OFFICER KEELER: What's that?

MR. GOSS: I said I can't say that I can.   I've been in this situation before, and the same reason why I went to jail before because somebody else told me that.

OFFICER KEELER: Told you what?

MR. GOSS: That – well, he asked me – they – I found out later that I didn't have to because it wasn't my vehicle.

OFFICER KEELER: Uh-huh (affirmative).

MR. GOSS: That I didn't have to (indiscernible) --

6

OFFICER KEELER: Who's it rented to?

MR. GOSS: Jenna Silver (ph).

OFFICER KEELER: Who?

MR. GOSS: Jennifer Silva.

OFFICER KEELER: Would there by any reason why a police canine would say there's something -- contraband of one –

MR. GOSS: No, no.

OFFICER KEELER: -- sort or another in the vehicle?

MR. GOSS: No.

OFFICER KEELER: Nope?

MR. GOSS: Not at all.

OFFICER KEELER: All right.  So if one's en route right now, they wouldn't have any –

MR. GOSS: No.  It that's –

OFFICER KEELER: -- any problem?

MR. GOSS: If that's what it takes for me to go home, whatever it takes, I'll just let (indiscernible) home.

OFFICER KEELER: Well, you can -- you can go home if you let me look in your vehicle real fast.

MR. GOSS: That's not my vehicle, you see what I'm saying?  I -- I had that problem before, and I know my rights now.  I'm not going to endanger myself or do anything stupid.  Like I said, if it's a canine unit, if that's what it takes, I -- I don't have nothing to do with that (indiscernible).  (Exhibit A beginning at

7

page 4)

Following the defendant's refusal to allow Officer Keeler to search his car Officer Keeler made the following statement to either the back up officer or to radio dispatch:

OFFICER KEELER: (Indiscernible) see if we can get 1 (indiscernible) 38 or some other canine unit that can come down and do a sniff on the car. (Exhibit A page 6)

After engaging the defendant in further conversation Officer Keeler made the following statement to the back up officer or radio dispatch:

OFFICER KEELER: 10-4. Do you have an ETA? (Exhibit A page 6)

After the defendant was informed that a police K-9 Unit was on the way to the scene Officer Keeler stated to the defendant:

OFFICER KEELER: All right. Well, I tell you what's going to go on. When the -- when the canine comes here, and if the canine alerts on this vehicle, if it alerts, if it says there's -- there's probably drugs in the vehicle, what -- I'll -- I'll impound the vehicle.

8

MR. GOSS: Right.

OFFICER KEELER: All right.  And I'll apply for a search warrant, and so –

MR. GOSS: that's all fine and dandy.  Like I said, whatever it takes.  It's just a little cold. (Exhibit A page 8-9)


On cross examination, Officer Keeler testified that his police uniform probably had long sleeves that night and that at the time he stopped the defendant and had him get out of his vehicle there was still some snow on the ground in Fairbanks.


On further cross examination and while reviewing the video tape of the encounter in court and while and referring to the time counter on the video tape Officer Keeler testified as follows. (Transcript 39 1-72)


Q:   And now at 23:18:52, you're having a discussion with Mr. Goss about whether or not he will give you consent to search his vehicle.   Correct?

A:   Yes, ma'am.

Q:   And he's telling you no, he does not want to give you consent to search his vehicle?

A:   Yes, ma'am.

Q:   Okay.  And you're alluding to the fact that there may be a K-9 on the way?

A:   Yes, ma'am.

Q:   And he says, "Well, whatever it takes for me to go home"?

A:   Yes, ma'am.

Q:   Okay.  And at that time you say, "Well, if you let me search your vehicle, you can go home"?

A:   Yes, ma'am.

Q:   Okay.  But he still says no?

A:   That's correct.

Q:   Okay.  At any time did you tell him that he didn't have to consent to search the vehicle?

A:   No, he told me that himself.

Q:   Okay.  At any time, did you tell him that he didn't have to consent to a K-9 search of the vehicle?

A:   No, ma'am.

Q:   At this time, would Mr. Goss have been free to leave had he wanted to?

A:   Yes.

Q:   Okay.  If he'd have walked away, you wouldn't have chased him?

A:   No.

Q:   Okay.  Have you issued him the citation yet?

A:   All we needed was to be signed by him.

Q:   Okay.  So it wasn't complete?

A:   Not without a signature, no.

Q:   Okay.  Had you returned his driver's license to him at

this time?

A:    No, ma'am.

Q:    So you still had possession of his driver's license?

A:    Yes, ma'am.

      (Pause - video playing)

Q:    So we're at 23:19:19.  Is that the time that you just
      called for K-9 to come?

A:    Yes, ma'am.


Approximately six minutes later at 11:26 p.m. the K-9 unit and
Officer Mobley arrived on the scene.  Officer Mobley took the
defendant out of view of the camera that was mounted in Officer
Keeler's patrol car and spoke to the defendant alone.  Officer
Mobley testified that the defendant verbally gave him permission to
search his car and that he believed his request of the defendant
was clear about what he wanted to do and that the defendant's
response was also clear.  Officer Mobley testified the defendant
placed no limitations on his consent to search the car.  Officer
Mobley testified that when his dog began the search of the
defendant's car, the dog alerted on the outside of the vehicle on
the driver's side at the crease between the door and the floor.
Officer Mobley testified he opened the door of the car and
instructed the dog to get inside the vehicle, whereupon the dog
alerted and then indicated for the presence of drugs in the center
console in the front of the car.  In the center console Officer

11

Mobley found the evidence defendant now seeks to suppress.

Officer Mobley further testified that he routinely downloads recorded conversations he has with suspects onto his police computer.  He does this not long after he recorded conversations with the subject on the field recorder he carries with him when he is in the field.  Officer Mobley testified that when he was downloading the defendant's recorded statements giving him permission to search the defendant's car Officer Mobley's computer "crashed" and the defendant's recorded statements were lost.  The government stated that despite their best efforts to recover the conversation between Officer Mobley and the defendant it could not be retrieved from Officer Mobley's hard drive.

## DISCUSSION

Both parties direct this court to U.S. v. Chavez-Valenzuela, 268 F.3d 719, (9th Cir. 2001).  Chavez-Valenzuela involved a situation wherein a motorist was stopped for speeding and as the police officer made contact with the motorist, the police officer observed the motorist shaking uncontrollably and the motorist would not make direct eye contact with the officer.  The police officer was informed that Chavez-Valenzuela's license and registration was valid and that he had no warrants outstanding.  The police officer returned Chavez-Valenzuela's license and registration to him

because the police officer had decided not to issue a speeding ticket to Chavez-Valenzuela.    The police officer then asked Chavez-Valenzuela if he had any drugs in the car.  Although Chavez-Valenzuela said no, the police officer asked to search the vehicle anyway.  Chavez-Valenzuela agreed to the consent search and signed a consent form to that effect.  In <u>Chavez-Valenzuela</u> the 9th Circuit stated:

> The Constitutionality of an investigative detention is judged under the framework established in <u>Terry v. Ohio</u>, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), requiring that the scope of an investigative detention "must be carefully tailored to its underlying justification ..., and [may] last no longer than is necessary to effectuate the purpose of the stop." <u>Florida v. Royer</u>, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).  An officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop. <u>United States v. Perez</u>, 37 F.3d 510, 513 (9th Cir.1994).  He may expand their scope only if he notices particularized, objective factors arousing his

13

suspicion.  Id. Conversely, an "inchoate and unparticularized suspicion or "hunch" cannot withstand scrutiny under the Fourth Amendment. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct 1581, 104 L.Ed.2d 1 (1989( (quoting Terry 392 U.S. at 27, 88 S.Ct 1868).

The Court further stated in Chavez-Valenzuela:

The decision to make a traffic stop is reasonable "where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

An encounter is not consensual if "a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)

Under the Fourth Amendment, however, evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding the

14

suspect's consent, unless subsequent events have purged the taint. <u>Royer</u>, 460 U.S. at 507-08, 103 S.Ct. 1319; <u>Wong Sun v. United States</u>, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); <u>United States v. Morales</u>, 972 F.2d 1007, 1010 (9th Cir. 1992). In determining whether the taint has been sufficiently purged, we ask "whether, granting establishment of the primary illegality, the evidence . . . Has been come at by exploitation of that illegality or instead by means of sufficiently distinguishable to be purged of the primary taint." <u>United States v. Millan</u>, 36 F.3d 886, 890 (9th Cir. 1994) (internal quotation marks omitted). Elements to be considered in answering this question include temporal proximity between illegality and consent and the presence of intervening circumstances. These factors "go primarily to the question whether an illegally arrested or detained defendant's response to police questioning is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" <u>United States v. George</u>, 883 F.2d 1407, 1416 (9th Cir. 1989)(quoting

15

Wong Sun, 371 U.S. at 486, 83 S.Ct. 407).  We
also take into account "the purpose and
flagrancy of the official misconduct."

## DID OFFICER KEELER VIOLATE DEFENDANT'S FOURTH AMENDMENT RIGHT BY EXCEEDING THE SCOPE OF THE TRAFFIC STOP?

The parties agree and the evidence supports the fact that the defendant was properly stopped for running a red light.  Defendant argues however that Officer Keeler had no reasonable suspicion for detaining him beyond the time it would have taken the officer to have written a citation for driving through a red light.  In support of his argument Defendant correctly states:

Reasonable suspicion exists if, looking at the totality of the circumstances, the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. Sigmond-Ballesteros, 285 F.3d at 1121 (quoting United States v. Arvizu, 534 U.S. 266 (2002)).  Questions asked during a traffic stop must be "reasonably related in scope to the justification for their initiation." United States v. Perez, 37 F.3d 510, 513 (9th Cir. 1994).  An officer may broaden the scope of questioning if he notices

16

additional suspicious factors. Id. But those
additional factors must be supported by
reasonable suspicion, i.e., particularized and
objective factors.

Here, Officer Keeler testified that he suspected that drug
trafficking might be taking place based upon the factors he noticed
when he first stopped the defendant. The evidence produced at the
hearing establishes that Officer Keeler could have finished writing
a citation for driving through the red light (8 minutes after the
stop) prior to the time he had the defendant exit his car and
"patted" him down. Shortly after the "pat down search" of the
defendant, Officer Keeler asked the defendant for permission to
search the car. This court finds that the length of time from
initial contact with the defendant to just before Officer Keeler
asked for permission to search the defendant's car was not
impermissibly prolonged. A traffic violation did take place and
the amount of time Officer Keeler took to write the traffic
citation was appropriate. In addition, the delay between when the
citation could have been given to the defendant to sign and the
point when officer Keeler asked for permission to search the car
was not prolonged.

The question remains however whether or not the continued
detention of the defendant, after he refused to allow Officer
Keeler to conduct a warrantless search of his vehicle, was

17

justified.    It appears from the record that in addition to his
observations made at the initial contact with the defendant,
Officer Keeler also observed the defendant was wearing expensive
jewelry and had an expensive watch when the defendant was told to
get out of his car and approach the front of Officer Keeler's
patrol car.    Officer Keeler did not clearly state how this
information added to his suspicions of drug trafficking by the
defendant.  This additional fact, even when combined with Officer
Keeler's other suspicions, can not support Officer Keeler's
continued detention of the defendant beyond when the ticket could
have been written and given to the defendant to sign.  It is clear
from the evidence that the defendant twice told Officer Keeler that
he did not want his car searched.  After the last refusal, Officer
Keeler continued to hold onto the defendant's license and did not
issue the defendant the traffic citation.  It is also clear that
when the defendant told Officer Keeler he would not grant the
officer permission to search his car that Officer Keeler did not
have probable cause to search the car absent permission from the
defendant to do so.

      Officer Keeler testified that after the defendant refused him
permission to search his car the defendant would have been free to
leave had he wanted to.  Officer Keeler testified that if the
defendant had walked away, he would not have chased him.  Officer
Keeler's testimony is not credible given the fact that, had the

defendant walked away from Officer Keeler, he would have had to have abandoned the car and perhaps his dogs that were still in the car.  If the defendant had tried to leave in his car, assuming Officer Keeler would have allowed him back into the vehicle, the defendant would have committed another traffic violation by driving without his license still in Officer Keeler's possession.  It is clear from the record that a reasonable person in similar circumstances would not have believed he would have been free to leave.  A reasonable person would have believed he was not free to go until Officer Keeler released him either after a citation was issued and the driver's license returned or after permission was given to Officer Keeler to search the car.

No contraband was seen by Officer Keeler that night, no furtive actions were made by the defendant and there were no overt indications that the defendant was then engaged in any kind of illegal activity except running a red light.  The fact that the defendant had a "3500 history" did not indicate that he was on parole, probation, or supervised release or that he had even been arrested for a drug offense.

The defendant's refusal to consent to a voluntary search of his vehicle can not be used against him as an additional suspicion that he was engaged in illegal activity.  The refusal to allow a consensual search can also not be used as a basis for prolonging the detention so that a K-9 unit could be summoned and then be

brought to the scene.  The encounter between Officer Keeler and the defendant was not consensual at any time.  The defendant was never free to leave after the initial stop on the road.  The traffic stop began at 11:10 p.m. and the K-9 Unit was not summoned until after the defendant refused to allow a warrantless search of his car. The only reason the dog was summoned to the scene was because the defendant refused to allow Officer Keeler to search his car.  The K-9 unit did not arrive until 11:26 p.m. some sixteen minutes after the defendant was pulled over for a routine traffic violation.  In the first eight minutes of the detention, Officer Keeler had enough time to write a traffic ticket and check all the pertinent information regarding the defendant's driving record and ownership of the vehicle.   In the first 8 minutes, Officer Keeler had all the knowledge he would have from his personal observations that led him to suspect the defendant was involved in drug trafficking.

After the defendant refused to allow a search, all the suspicions testified to by Officer Keeler did not amount to sufficient justification to continue to detain the defendant beyond the time the citation could have been completed and presented to the defendant to sign.

This court therefore finds that any detention of the defendant beyond the time the defendant told Officer Keeler he could not search his vehicle was unjustly prolonged and exceeded the scope of the traffic stop.

<u>WAS THE ALLEGED CONSENT BY DEFENDANT TO PERMIT A K-9 SEARCH OF</u>

<u>HIS VEHICLE VOLUNTARY</u>

This court finds that the defendant was not free to break off his contact with Officer Keeler nor was he free at any time to leave the scene.  The defendant told Officer Keeler "If that's what it (the search) takes for me to go home, whatever it takes, I'll just let (indiscernible ) home."  To which Officer Keeler stated "Well, you can -- you can go home if you let me look in your vehicle real fast."  This court finds that, in effect, Officer Keeler required the defendant to choose between going home immediately and allowing a search of his car.  The defendant clearly wanted to go home and a reasonable person under the same circumstances would have concluded that the only way he was going to be able to go home that night was to allow either Officer Keeler or the K-9 unit to search his car.  This court therefore finds that any permission allegedly given by the defendant to Officer Keeler to allow a K-9 unit to search defendant's car was  involuntarily given during an illegal detention.

<u>WAS THE ALLEGED SUBSEQUENT CONSENT BY THE DEFENDANT TO ALLOW</u>

<u>OFFICER MOBLEY'S K-9 DOG SEARCH THE VEHICLE TAINTED BY THE</u>

<u>ILLEGAL DETENTION</u>

The government argues that if the court finds the detention of the defendant was not based upon a sufficient reasonable suspicion

"the consent of the defendant can still be deemed valid if the consent was voluntary, and was not tainted by any unlawful activity by the police. United States v. George, 883 F.2d 1407, 1415, (9th Cir.1989)".

The Government argues, in effect, that when the defendant refused to allow Officer Keeler to search his car, and then changed his mind and allegedly allowed Officer Mobley to search his car, the taint of the previous illegal detention was removed because of the intervening act of the defendant demonstrating that he knew he did not have to consent to a search and then subsequently allowing a serach by the K-9 unit.

In United Sates v. Washington, 387 F.3d 1060 (9th Cir.2004) the court was presented a fact pattern wherein the defendant had been illegally detained but signed a consent form which clearly stated that he did not have to consent to the search of his residence. The court stated:

> The Government argues that when Washington signed the permission to search form, which advised him of his right to refuse to consent, that act was an intervening event sufficient to purge the taint of the officers' prior illegal conduct.

> We disagree.  Washington's act of signing

22

the permission to search form, which advised
him of his right to refuse to consent, is
distinct from examples of "intervening
circumstances" that have been considered
sufficient to purge the taint of prior
constitutional violations. *See id.* Unlike
releasing an individual before a magistrate,
or allowing an individual to consult with an
attorney, signing a permission to search form,
which advises of the right to refuse to
consent, does not have a tendency to distance
the suspect from the coercive effects of
temporally proximate constitutional
violations. Rather, the suspect's desire to
avoid suffering additional constitutional
violations and/or a continuing
unconstitutional detention, as in this case,
is what may prompt the suspect to avoid
further confrontation by giving consent.

The Government argues that when the defendant refused to
permit a warrantless search "the officer accepted his decision."
If that were true, the police would have presented the citation to
the defendant to sign, returned his license and allowed him to
leave. It is clear that Officer Keeler did not accept the

defendant's refusal to search the car.  Instead Officer Keeler told the defendant a K-9 unit was already on the way.  However, this was not true as the K-9 unit was summoned after the defendant refused to allow the search of his car.

As set forth above this court believes an illegal detention of the defendant began the moment after the defendant refused Officer Keeler permission to search his car.  The illegal detention encompassed the subsequent arrival of the K-9 Unit with Trooper Mobley whose sole purpose on the scene was to search the defendant's vehicle.  Trooper Mobley had no independent probable cause to search the defendant's car and any permission allegedly given by the defendant to Officer Mobley to search his car was tainted by the prolonged illegal detention that started when Officer Keeler decided not to send the defendant on his way with a traffic citation after the defendant refused to allow a search of the car.

This court finds that any detention beyond the time the defendant refused to allow Officer Keeler to search his vehicle was impermissibly prolonged and that any subsequent permission to conduct a warrantless search, given by the defendant, was not the type of intervening act sanctioned by the Washington court that would remove the taint from the illegal detention.

Based upon the foregoing this court respectfully recommends

24

that the defendant's Motion to Suppress be granted.

DATED this _____day of _____, 2006, at Fairbanks, Alaska.


                        _____S/TERRANCE W. HALL_____
                        TERRANCE W. HALL

                        U.S. Magistrate Judge


        Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to
this proposed finding and recommendation shall file written
objections with the Clerk of Court no later than **NOON, Thursday,
August 31, 2006**, to object to a magistrate judge's findings of
fact may be treated as a procedural default and waiver of the
right to contest those findings on appeal. McCall v. Andrus, 628
F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996
(1981). The Ninth Circuit concludes that a district court is not
required to consider evidence introduced for the first time in a
party's objection to a magistrate judge's recommendation United
States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and
responses shall not exceed five (5) pages in length, and shall
not merely reargue positions presented in motion papers. Rather,
objections and responses shall specifically designate the
findings or recommendations objected to, the basis of the
objection, and the points and authorities in support. Response(s)
to the objections shall be filed **on or before 4:30 p.m., Tuesday,
September 5, 2006.** The parties shall otherwise comply with
provisions of D.Ak.L.M.R. 6(a).

        Reports and recommendations are not appealable orders. Any
notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be
filed until entry of the district court's judgment. See Hilliard
v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).